**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GAME SEVEN EVERYDAY INC. D/B/A CONSTANTLY CREATE SHOP, JOSEPH ANGEROSA, and DENNIS KINSLOW,<br><br>                    Plaintiffs,<br><br>          v.<br><br>JOSEPH CONKLIN, THOMAS SHARKEY, HUNTER COLE, CORY AMAROSA, and DANIEL AMAROSA,<br><br>                    Defendants. | Civ. No. 22-CV-3394<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Game Seven Everyday Inc. d/b/a Constantly Create Shop ("Constantly Create Shop"), Joseph Angerosa ("Angerosa"), and Dennis Kinslow ("Kinslow") (together, "Plaintiffs"), as and for their Complaint against Joseph Conklin ("Conklin"), Thomas Sharkey ("Sharkey"), Hunter Cole ("Cole"), Cory Amarosa, and Dan Amarosa (together "Defendants"), allege as follows:

**SUMMARY OF THE ACTION**

1.      This is a civil action arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* and New York common law, in which Plaintiffs seek to recover damages from Defendants' intentional, unlawful reproduction and sale of Constantly Create Shop's original artwork for profit as well as breach of the agreement to compensate Plaintiffs Angerosa and Kinslow for their services.

2.      This case arises out of Defendants' scheme, fueled by a global frenzy over cryptocurrencies and human greed, to raise hundreds of thousands of dollars through sales of non-fungible tokens ("NFTs") that used original digital artwork created by Plaintiff Constantly Create Shop.

3. In the summer of 2021, Defendant Conklin sought to capitalize on the fervor for NFTs by promising that he and his associates would develop a "Grumpy Grandpas" NFT project (the "NFT Project"), https://grumpygrandpasnft.com/, which would sell digital artwork NFTs. In addition to original, digital images, the NFTs would provide its purchasers with access to a "community" and voting rights to direct the distribution of the profits from the sales of the NFTs.

4. Over the course of the next several months, Conklin discussed the NFT Project with other Defendants, and they have agreed to form an unincorporated association to promote the NFT Project on various social media platforms, generate sales, and pocket the sales proceeds.

5. Defendants contributed capital to cover the NFT Project's expenses, and Conklin repeatedly referred to other Defendants as "team members" in his public communications via various social media platforms and the NFT Project's website.

6. In August 2021, Conklin was introduced to Plaintiffs Angerosa and Kinslow. Angerosa and Kinslow are co-founders of Constantly Create Shop, a small local business that creates custom apparel for businesses, brands, and events.

7. Conklin asked Angerosa and Kinslow to create original digital artwork that the NFT Project would use to sell the NFTs, in exchange for a share of the NFT sales proceeds. Plaintiffs Angerosa and Kinslow agreed, and from August through October, Constantly Create Shop committed hundreds of hours and significant resources to designing and producing various elements to generate 10,000 unique digital images that would be associated with the NFTs that the NFT Project promoted on social media platforms and made available for sale on its website and digital asset trading platforms.

8. Plaintiffs Angerosa and Kinslow also agreed to provide social media management services to the NFT Project, for additional compensation.

9.     In October 2021, Defendants raised the equivalent of approximately $645,000 from the sale of NFTs that used Constantly Create Shop's original digital artwork; they did not, however, compensate Constantly Create Shop for the use of its artwork, nor did they compensate Angerosa and Kinslow for providing additional services to the NFT Project, as agreed on.

10.    Defendants are not the copyright owners and have no right to reproduce Constantly Create Shop's artwork, distribute copies, create derivative works, or display it publicly, and their actions violate several provisions of the Copyright Act.

11.    Plaintiffs demanded that Conklin and his associates stop displaying and selling Constantly Create Shop's original digital artwork, to no avail.

## PARTIES

12.    Plaintiff Game Seven Everyday Inc. d/b/a Constantly Create Shop is a New York corporation headquartered in New Hyde Park, Nassau County, New York.

13.    Plaintiff Angerosa is an individual domiciled in Floral Park, Queens County, New York, is over 18 years old, and is otherwise *sui juris*. Angerosa is a co-founder and CEO of Constantly Create Shop.

14.    Plaintiff Kinslow is an individual domiciled in Bellerose, Queens County, New York, is over 18 years old, and is otherwise *sui juris*. Kinslow is a co-founder of Constantly Create Shop.

15.    Defendant Conklin is an individual domiciled in East Islip, Suffolk County, New York, is over 18 years old, and is otherwise *sui juris*. Conklin holds himself out as a co-creator of the "Grumpy Grandpas" NFT Project.

16.    Defendant Sharkey is an individual domiciled in Ronkonkoma, Suffolk County, New York, is over 18 years old, and is otherwise *sui juris*. Sharkey contributed to the development

of the "Grumpy Grandpas" NFT Project as part of its "dedicated promo team" and acted in concert with Conklin and other Defendants to commit the unlawful acts described in this complaint.

17.     Defendant Cole is an individual domiciled in Great River, Suffolk, County, New York, is over 18 years old, and is otherwise *sui juris.* Cole contributed to the development of the "Grumpy Grandpas" NFT project "in literally every aspect of the project, whether it was some coding tweaks or some creative writing" and acted in concert with Conklin and other Defendants to commit the unlawful acts described in this complaint.

18.     Defendant Cory Amarosa is an individual domiciled in Coram, Suffolk County, New York, is over 18 years old, and is otherwise *sui juris.*

19.     Defendant Daniel Amarosa is an individual domiciled in Coram, Suffolk County, New York, is over 18 years old, and is otherwise *sui juris.*

20.      Cory and Daniel Amarosa are twin brothers who have previously been arrested and pleaded guilty to robbing two banks in Centereach, New York, in the spring of 2012. They are "critical contributors to [the 'Grumpy Grandpas'] promo team" and acted in concert with Conklin and other Defendants to commit the unlawful acts described in this complaint.

21.     All Defendants are members of an unincorporated association, the NFT Project, which is a general partnership organized to profit from the sale of "Grumpy Grandpas" NFTs. The partnership is headquartered in Suffolk County, New York, where its co-founder and primary decisionmaker – Defendant Conklin – lives.

22.     Each Defendant acted as the partnership's member and agent in committing the unlawful acts described in this complaint and is jointly and severally liable for injuries to Plaintiffs.

## JURISDICTION AND VENUE

23.     The court has original jurisdiction of this action under 17 U.S.C. § 501, *et seq.*, and 28 U.S.C. §§ 1338(a).

4

24.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' claims arising under New York law because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

25.     Venue in this district is proper under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the within claims occurred in this judicial district, and under 28 U.S.C. § 1400(b) in that it is a judicial district where Defendants have committed acts of copyright infringement and had a regular and established place of residence.

## BACKGROUND FACTS

<u>Blockchain Technology and NFTs</u>

26.     The term "digital asset" generally refers to an asset issued or transferred (or both) using distributed ledger, or blockchain technology. It includes assets sometimes referred to as cryptocurrencies, virtual currencies, digital coins, and digital tokens. Cryptocurrency owners typically store their digital assets in digital "wallets," which are identified by unique electronic "addresses."

27.     Bitcoin was the world's first, and most popular, cryptocurrency. It currently has a market capitalization of more than $890 billion, and investor enthusiasm surrounding bitcoin has generated a broad market for other cryptocurrencies with some varying features.

28.     The core technical feature of most cryptocurrencies is the "blockchain," or distributed ledger, which is essentially a peer-to-peer database spread across a network of computers that tracks ownership and transfer of the cryptocurrency at issue. As the SEC explained in a July 2017 investor bulletin:

> A blockchain is an electronic distributed ledger or list of entries –
> much like a stock ledger – that is maintained by various participants

in a network of computers. Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.

29.     Information held on a blockchain exists as a shared and continually reconciled database. The blockchain database is not stored in any single location; rather, it is distributed – or decentralized – because it is hosted and perpetuated by a large network of computer "nodes." This means that, for a widely distributed blockchain network, it would be extremely difficult, if not impossible, to submit a false or malicious transaction because a malicious actor would have to gain control of the majority of the nodes on the blockchain to achieve its purpose. Once a transaction is recorded on the blockchain, it cannot be cancelled, changed, or reversed, and all transaction records are available all the way back to the blockchain's inception.

30.     The blockchain records, among other things, the date and time of each cryptocurrency transaction, the unique cryptocurrency addresses associated with the transaction and the sending and receiving parties, and the amount of cryptocurrency transferred, but does not identify the parties that control the cryptocurrency addresses involved in the transaction. Because each cryptocurrency address is unique, anyone can review the blockchain to identify relevant cryptocurrency transactions and trace the flow of cryptocurrency across various cryptocurrency addresses.

31.     Each blockchain is subject to different technical rules devised by their creators, but they all seek to attain the goal of decentralization. To achieve this, they provide a framework of incentives to encourage users to do the work of validating transactions, which often requires significant computational mechanics. This has the effect of making the blockchain more accurate and secure. In the instance of the Bitcoin network, users who validate transactions on the Bitcoin

blockchain are rewarded with newly minted bitcoin. In bitcoin parlance, this process is referred to as "mining," and those who validate information in exchange for bitcoin are called "miners."

32.     Those who do not acquire bitcoin through mining may purchase it on digital asset trading platforms. These platforms provide a convenient and accessible marketplace for buyers and sellers to meet and transact, similar to traditional exchanges. Bitcoin – and other cryptocurrencies – may be traded on digital asset trading platforms in exchange for other digital assets or fiat currency (legal tender issued by a country), at times being allocated to investors' accounts in the records of the platform (*i.e.*, "off-chain"), without necessarily being transferred from one blockchain address to another (*i.e.*, "on-chain").

33.     Ethereum is another type of blockchain, and it functions similarly to the Bitcoin blockchain with regard to miners' validation of the network, except in this case, they are rewarded with newly minted ether. Ethereum differs from Bitcoin, however, because it enables "smart contracts," which are programs that verify and enforce the negotiation or performance of binary contracts. They are thus self-executing and self-enforcing, making the transactions more secure and less costly.

34.     Solana is yet another, newer blockchain platform that enables smart contracts and claims to have the capability to vastly improve on the cost and speed of transactions, compared to Ethereum. The digital assets, or tokens, native to the Solana blockchain are called SOL coins.

35.     To understand a smart contract in more concrete terms, consider a hedging contract. Each party may dedicate $1,000 worth of ether, and at the end of the month, one will receive back $1,000 of ether at the dollar exchange rate, while the other receives the remainder of the ether. Depending on whether ether's value has increased, the party receiving the remainder of the ether may have an asset worth more or less than the $1,000 originally committed. A smart contract enables these parties to submit the ether to a secure destination, which will automatically distribute

the ether in accordance with the terms of the hedging contract at the end of the month, without any third-party action. Smart contracts can be used to create – or mint – various types of digital assets, including non-fungible tokens, or NFTs.

36.     NFTs have been widely adopted by the sports, arts, music, gaming, fashion, and other industries.

37.     Similar to other new and evolving technologies and concepts in the blockchain industry, there is not a uniform definition of the term "non-fungible token." There are fundamental characteristics, however, that are common to most NFT projects in the marketplace today and on which participants in this ecosystem tend to agree. In essence, an NFT is (i) a unique digital token recorded on a distributed ledger, such as a blockchain; (ii) linked to an object, such as a digital image, video, or record; that (iii) enables the holder to demonstrate its rights with respect to the linked object. For example, an NFT linked to a digital artwork may enable its holder to access, perform, and display the digital artwork on an exclusive or nonexclusive basis.

38.     Each NFT is commonly referred to as a "token" and is uniquely identifiable on the blockchain.

39.     The process of turning a digital file into an NFT (*i.e.* a crypto collectible or digital asset) on the Ethereum or Solana blockchain is typically referred to as "minting." The digital file is stored on the blockchain, and typically cannot be edited, modified, or deleted.

40.     The minting of a NFT requires the creation of a "smart contract," which is recorded on the blockchain and outlines the rules that will govern the sale of and any subsequent transfers of the NFTs after minting. NFT smart contracts are written in computer code and publicly viewable on the blockchain.

41.     NFTs are bought and sold online, via digital asset trading platforms, usually in exchange for other digital assets, and they are generally encoded with the same underlying software as many cryptocurrencies.

42.     Although NFTs are generally minted using the same kind of programming as other digital assets, like bitcoin or ether, that is where the similarity ends. Physical money and cryptocurrencies are "fungible," meaning that they can be traded or exchanged for one another. They are also equal in value, *i.e.*, one dollar is always of equal value to another dollar, and one bitcoin is always equal to another bitcoin.

43.     NFTs are different. Each NFT has a unique digital signature that makes it impossible for NFTs to be exchanged for or equal to another (hence, non-fungible, or non-interchangeable). Essentially, NFTs are similar to physical collector's items that exist in the digital realm. So, instead of owning an actual oil painting to hang on the wall, the buyer gets a digital file.

44.     Although they have been around since 2014, NFTs are gaining notoriety now because they are becoming an increasingly popular way to buy and sell digital artwork. A staggering $174 million has been spent on NFTs since November 2017.

45.     Since its release in 2019, the Solana blockchain platform has gained popularity for enabling creators to quickly and efficiently mint NFTs.

The "Grumpy Grandpas" NFT Project

46.     Plaintiffs Angerosa and Kinslow are entrepreneurs who have used their experience, talent, and creativity developed over years of hard work to co-found their business, Game Seven Everyday, d/b/a Constantly Create Shop, a New Hyde Park-headquartered company that creates custom apparel for businesses, brands, and events.

47.     As entrepreneurs, Angerosa and Kinslow manage each and every element of their business, including developing the artwork, which is the product of their creativity and hard work.

48.     In August of 2021, Angerosa and Kinslow were introduced to Defendant Conklin by a mutual friend. At that time, Conklin was looking for collaborators on his "Grumpy Grandpas" NFT project, which involved minting NFTs of thousands of unique digital artworks and marketing and selling them to the public.

49.     Conklin asked Angerosa and Kinslow if Constantly Create Shop would design and produce 413 unique elements that would be used to generate 10,000 digital images of Grumpy Grandpas. Those digital images, in turn, would be associated with the NFTs minted on the Solana blockchain and made available for sale on digital asset trading platforms.

50.     Instead of paying a fixed fee for their artwork, Conklin offered to share the profits from the sale of the NFTs, whereby Constantly Create Shop would receive a portion of the net proceeds generated by the Grumpy Grandpas NFT sales. Angerosa and Kinslow agreed.

51.     On October 18, 2021, Conklin offered Constantly Create Everyday one-half, or 50%, of the net proceeds from the sales of Grumpy Grandpas NFTs, provided that Conklin would see and approve sample digital artwork created by Plaintiffs.

52.     Plaintiffs provided – and received Conklin's approval – of the sample artwork, and Conklin confirmed his offer of one-half, or 50%, of the NFT sales proceeds.

53.     Over the next month, Constantly Create Shop spent extensive time designing the elements to create 10,000 pieces of unique, original artwork for the Grumpy Grandpas project. While the process involved significant time, money, and effort, Plaintiffs deemed it worthwhile and valuable to ensure that the Grumpy Grandpas NFT project was successful and to promote their business.

54.     Angerosa and Kinslow also contributed other services to the project, including participating in, moderating, and managing Grumpy Grandpas social media platforms, including Discord and Instagram.

55.    In October 2021, Conklin acknowledged Constantly Create Shop's contribution to the project in a statement posted on-line:

> Then we have our artists, the insanely talented folks from Constantly Create Shop . . . . We've spent countless days and nights perfecting our Grumpy's [sic] to ensure all 10,000 of them were perfect. We're blessed to have these guys on the team and couldn't have done this without them.

56.    In or about October 2021, Conklin and other Defendants began advertising the sale of Grumpy Grandpa NFTs on various social media platforms, including, among others, Twitter, Instagram, and Discord. These platforms directed interested purchasers to a particular website, https://grumpygrandpasnft.com/ (the "Grumpy Grandpas Website").

57.    The Grumpy Grandpas Website advertised the sale of Grumpy Grandpa NFTs — digital images of elderly men (grandpas). The image below is a screenshot taken from the Grumpy Grandpas Website, which shows some of the various Grumpy Grandpas digital images that were available for purchase:



58.    The Grumpy Grandpas Website lists "MorrixBX" (Conklin's alias) as the "Dev/Co-creator," Constantly Create as the "Artists/Co-creators," and the entire team as the following:



59.    Between on or about November 10, 2021, and on or about November 12, 2021, the Grumpy Grandpas Website permitted individuals to purchase one or more Grumpy Grandpa NFTs (which used the digital images created by Constantly Create Shop) through either a private presale or a public sale.

60.    At or around the time of purchase/minting, the purchaser was provided with the unique Solana smart contract address for the Grumpy Grandpas NFT project (the "Grumpy Grandpas Smart Contract"), which also served as the particular cryptocurrency wallet address to transfer the desired amount of SOL coins in exchange for the equivalent number of Grumpy Grandpas NFTs ("Grumpy Grandpas Wallet Address").

61.    Conklin is the sole owner of the private key that permitted access to the digital assets at Grumpy Grandpas Wallet Address.

62.    Each minted Grumpy Grandpa NFT was publicly recorded on the Solana blockchain along with the Grumpy Grandpas Smart Contract.

63.    The private presale took place between on or about November 10, 2021. On November 11, 2021, following the private presale, the Grumpy Grandpas public sale went live.

Roughly 26 hours after the public sale went live, Conklin and his team stopped the mint at 5,400 Grumpy Grandpas NFTs, 1,400 of which were sold to the public, and began the process of listing them on secondary digital asset trading platforms, including Magic Eden, Solsea, and Digital Eyes.

64.     The sale raised around 2,800 SOL, then valued at approximately $645,000, deposited at Grumpy Grandpas Wallet Address.

65.     On November 13, 2021, to compensate Plaintiffs for their significant contributions to the project, in addition to designing and producing Grumpy Grandpas artwork, Conklin offered – and Plaintiffs agreed – to pay Plaintiffs two-thirds of the profits generated from the sales of the NFTs that used their artwork.

66.     Immediately following the end of the sale, Conklin distributed 364 SOL (then valued at approximately $83,720) of the gross sale proceeds to Defendants Sharkey, Cole, and Corey and Daniel Amarosa, as well as 310 SOL (then valued at approximately $71,300) to himself.

67.     Before Conklin could pay Plaintiffs their share of the proceeds, Conklin informed them that he had to pay one more remaining investor and that he was waiting for that investor to provide the wallet address where Conklin would transfer the payment.

68.     Conklin told Plaintiffs that he expected to pay them their agreed-on share of the profits in the morning, on November 14, 2021. Not suspecting Conklin of ulterior motives for the delay, Plaintiffs agreed to wait.

69.     In flagrant breach of their agreement, however, Conklin never paid Plaintiffs their agreed-on share of the profits for their digital artwork that Conklin and his associates used to promote and sell Grumpy Grandpas NFTs and that appears to this day on Grumpy Grandpas Website to promote the project, without Plaintiffs' permission.

<u>The Suspicious Transfers</u>

70.     On November 14, 2021, at or about 5:30 am EST, hours after their conversation with Conklin and shortly before Plaintiffs expected Conklin to transfer the payment, the remaining proceeds of the Grumpy Grandpas NFT sale (in total, approximately 2,126 SOL coins, then valued at approximately $510,141.84) were transferred from the Grumpy Grandpas Wallet Address to five separate Solana cryptocurrency wallets:

- 7wy2RVZTx3UR92FSg6rWgKvj3XwonEaSiSUKDwh9uk8n (500 SOL)

- 4oqaScqZqaw8BnJ5GRsd6DSZ7ZSgLhyXhcaAs2QvbaMF (500 SOL)

- C5FuAeRxVmEnjdR7FJWiLftnsjrYmegG2e39YHRNYoQ8 (400 SOL)

- A7gSeU1bSsJCL2PTSpKMW2xJ4gBEzXxsEdhUZDRxnAkG (400 SOL)

- 298Sse3yog5JfGtH43HCCSqdcGX4SApxHg7JKzwj4AVH (325.591085867 SOL)

71.     Because each cryptocurrency transaction is publicly recorded on the blockchain, anyone could observe the transfer of all the Grumpy Grandpas sale proceeds at or near real-time and can still do so today.

72.     Eventually, the funds flowed from the above-mentioned Solana wallet addresses to a Solana wallet associated with a digital asset trading platform FTX.

73.     Shortly after those events took place, Conklin announced on social media sites, including Discord and Medium, that the funds were stolen from the Grumpy Grandpas Wallet and that Conklin reported the incident to the authorities. Conklin stated, "Since then, we have made a lot of progress in connecting our resources to effectively combat the theft and I for one am extremely grateful for the authorities and agencies who have been there for us throughout this."

74.     To the Plaintiffs, however, Conklin painted a different picture.

75.     On November 14, 2021, several hours after the funds were transferred from the Grumpy Grandpas Wallet, Conklin informed Angerosa about the transfers, stating that, "All the money is gone." Conklin stated that, because the funds had been stolen, he would not pay Plaintiffs anything.

76.     Upon learning that Conklin would not pay Constantly Create Shop for its Grumpy Grandpas digital artwork, Angerosa immediately objected to Conklin's use of the artwork and demanded that Conklin immediately return all Grumpy Grandpas digital artwork to Constantly Create Shop, including all minted NFTs that used the artwork.

77.     Angerosa also demanded that Conklin provide to him the information about the fund transfers and asked him what steps Conklin was taking to recover the stolen funds.

78.     Shortly thereafter, Conklin provided the transfer transaction details to Angerosa and told him that he contacted several major digital asset trading platforms and informed them about the unauthorized fund transfers, requesting that they block any attempts to move or exchange the funds. Conklin also told Angerosa that he had retained a forensic investigator (TRM Labs), scheduled a consultation with an attorney to discuss the incident, and filed a police report.

79.     On November 16, 2021, only two days after the alleged theft of over $500,000, Conklin appeared to lose interest in attempting to recover the funds, suggesting to Plaintiffs to "put it all behind us" and focus on future opportunities instead.

80.     Angerosa, taken aback by Conklin's disinterest in pursuing the recovery of what is, unquestionably, a life-changing amount of money, continued to encourage Conklin to pursue legal remedies, to no avail.

81.     Since November 2021, Plaintiffs hired a cryptocurrency forensic investigator to trace the movement of stolen funds, and the investigator identified the wallet, associated with the

FTX digital asset trading platform, where the stolen funds were deposited following movement through various other cryptocurrency wallets.

82.    Plaintiffs provided the above-mentioned information to Conklin, so that he – as the owner of the wallet from which the funds were improperly removed – could work with law enforcement to uncover the identity of the person(s) who completed the transactions that placed the stolen funds into the identified FTX wallet, to no avail.

83.    To date, Conklin has not provided Plaintiffs with any information relating to his pursuit of recovery of the stolen funds and has avoided any contact with Plaintiffs, raising reasonable suspicion that Conklin is associated with the improper removal of the funds and is, therefore, not incentivized to recover them.

## COUNT I
### Copyright Infringement
### (Against All Defendants)

84.    Plaintiff Constantly Create Shop repeats and realleges the foregoing paragraphs as if fully set forth and incorporated herein.

85.    At all relevant times, Plaintiff Constantly Create Shop has been and still is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et. seq.*, and all amendments thereto) (the "Copyright Act") to reproduce, distribute, display, or license the reproduction, distribution, and/or display of its digital artwork, which is the subject of this action (referred to in this action as the "Grumpy Grandpas" artwork), throughout the United States.

86.    Defendants, as part of the NFT Project, used Constantly Create Shop's digital artwork to mint and sell Grumpy Grandpas NFTs to the general public and advertised the sale on the Grumpy Grandpas Website and social media platforms, including Discord, Instagram, and Twitter.

16

87. As of the date of this Complaint, the Grumpy Grandpas Website, displaying Constantly Create Shop's Grumpy Grandpas digital artwork and advertising Grumpy Grandpas NFTs for sale on various digital asset trading platforms, remains active and available.

88. Defendants' wrongful actions caused Plaintiffs severe distress. The experience detracted from Plaintiffs' work both psychologically and economically. Because of Defendants' wrongful acts, Plaintiffs had to focus all their efforts on dealing with negative publicity generated by the NFT Project, as well as with their work being taken, copied, and used to sell NFTs for profit without their permission.

89. In using Constantly Create Shop's Grumpy Grandpas digital artwork to mint and sell NFTs for sale to the general public, Defendants intentionally sought to appropriate Plaintiff's hard work for their own profit, without bearing the cost thereof. The time commitment of creating and developing the artwork was a substantial investment for Plaintiff, a small business based solely on its co-founders' own work. Defendants sought to realize the same profit without investing any amount of money, time, and creative thought and to take away profits from Plaintiffs.

90. Each of the 413 elements of the Grumpy Grandpas artwork is an original work, copyrightable under the Copyright Act, and Constantly Create Shop has the exclusive rights and privileges to reproduce, distribute, and display the elements of the Grumpy Grandpas artwork.

91. Defendants infringed Constantly Create Shop's exclusive rights in the elements of the Grumpy Grandpas artwork by copying, reproducing, duplicating, distributing, and displaying it and derivative works derived therefrom without Constantly Create Shop's permission.

92. Each infringing copy, duplication, sale, license, or display of the Grumpy Grandpas artwork, as well as the threat of continuing the same, constitutes a separate claim against Defendants under the Copyright Act. Defendants have realized unlawful and unjust profits from

their unauthorized and illegal copying, duplication, distribution, and display of copies of the Grumpy Grandpas artwork.

93.     Defendants have committed all of the aforesaid acts deliberately, willfully, maliciously and oppressively, without regard to Constantly Create Shop's proprietary rights.

94.     The above-described conduct by Defendants constitutes willful copyright infringement under the Copyright Act.

95.     As a result of the above-described conduct, Constantly Create Shop has been damaged in an amount to be proven at trial.

96.     By reason of the copyright infringement described above, Constantly Create Shop is entitled to recover Defendants' profits to the extent the same are not included as part of Plaintiff's damages.

97.     In the alternative, at the election of Plaintiff, Plaintiff is entitled to recover from Defendants statutory damages up to $150,000.00 per copyright infringed for their willful copyright infringement, plus attorneys' fees.

## COUNT II
### Breach of Contract
### (Against All Defendants)

98.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and incorporated herein.

99.     Plaintiffs and Defendant Conklin, on behalf of the NFT Project, agreed that Plaintiffs would design and produce original digital artwork and provide social media platform moderation services, and the NFT Project could sell or license Constantly Create Shop's digital artwork, in exchange for the payment of one two-thirds of the profits generated from the sales of the NFTs that used the artwork.

100.    The agreement between Plaintiffs and the NFT Project (the "Agreement"), which is a general partnership comprised of all Defendants, is a valid, binding, and enforceable contract.

101.    Pursuant to the Agreement, Plaintiffs provided the artwork and their services to the NFT Project, and the NFT Project used the artwork created by Plaintiffs to mint and sell Grumpy Grandpas NFTs.

102.    Defendants breached the Agreement by refusing to pay the agreed-on fee to Plaintiffs.

103.    As a result of Defendants' breach, Plaintiffs have been damaged in the amount of $325,000, together with interest thereon, and attorney's fees and costs incurred in connection with enforcing Defendants' obligations under the Agreement.

### COUNT III
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Against All Defendants)**

104.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and incorporated herein.

105.    Plaintiffs and Defendant Conklin agreed that the NFT Project could use, sell, or license Plaintiffs' digital artwork, and that Angerosa and Kinslow would provide it with social media management services, in exchange for the payment of two-thirds of all the profits generated from the sales of the NFTs that used Constantly Create Shop's artwork.

106.    The Agreement between Plaintiffs and the NFT Project, which is a general partnership comprised of all Defendants, is a valid, binding, and enforceable contract.

107.    By entering into the Agreement, Defendants – as members of the NFT Project – assumed the duty of utmost good faith and fair dealing during its performance, meaning that he

covenanted not to do anything that would have the effect of destroying or injuring Plaintiffs' rights to receive the fruits of the contract.

108.     At all times relevant here, Defendants had a duty to act in good faith and diligently honor and perform their obligations under the agreement and to deal with Plaintiffs fairly.

109.     Defendants breached the covenant of good faith and fair dealing towards Plaintiffs by failing to safeguard the funds that were earmarked for compensating Plaintiffs for using Grumpy Grandpas digital artwork to mint and sell Grumpy Grandpas NFTs and to promote the Grumpy Grandpas NFT Project.

110.     Having promised to Plaintiffs two-thirds of the benefits of the sale of Grumpy Grandpas NFTs, there was an implied obligation on the part of Defendant not to diminish the right conferred by the contract, especially in view of the fact that they breached the express covenant to pay Plaintiffs two-thirds of the profits from the sale of Grumpy Grandpas NFTs.

111.     Having breached the agreement, Defendants cannot be permitted to retain the full profits resulting from the wrong.

112.     Plaintiffs have and continue to be damaged by Defendants' misconduct because the time commitment of creating and developing the artwork and providing social media management services was a substantial investment for Plaintiffs, as individuals who run a small business based solely on their own work.

**COUNT III**
**Unjust Enrichment**
**(Against All Defendants)**

113.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and incorporated herein.

114.    All Defendants colluded to convey a benefit on Defendants to the detriment of Plaintiffs.

115.    Defendants caused themselves to be enriched and conveyed benefits on themselves at the expense of the Plaintiffs under circumstances where it would be inequitable for Defendants to retain the benefits conveyed.

116.    In the alternative that the Court does not find that a contract existed between Plaintiffs and any of the Defendants, the Court should find that principles of equity and good conscience do not permit Defendants to retain the $325,000 due and owing to Plaintiffs for use of Constantly Create Shop's original artwork and for Angerosa's and Kinslow's social media management services.

117.    Each Defendant should be required to disgorge any such benefit to the Plaintiffs in amounts to be determined at trial.

## JURY DEMAND

Plaintiffs demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For Judgment in Plaintiffs' favor and against Defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $325,000, plus statutory damages of $150,000 per copyright infringed for willful copyright infringement plus pre-judgment interest;

2.    For an Order enjoining Defendants, the NFT Project, and any of their officers, agents, employees, and those acting in concert or conspiracy with them, temporarily during the pendency of this action and permanently thereafter from:

      (a)    Infringing, or contributing to or participating in the infringement by others of copyright in the Grumpy Grandpas digital artwork or acting in concert with, aiding and abetting others to infringe said copyright in any way;

      (b)    Copying, duplicating, selling, licensing, displaying, distributing, or otherwise using without authorization copies of the Grumpy Grandpas digital artwork to which Constantly Create Shop is owner of exclusive rights under the respective copyrights or derivative works based thereon

3.    That Defendants, jointly and severally, be required to account for and pay Plaintiffs the actual damages suffered by Plaintiffs as a result of the infringement and any profits of the Defendants attributable to the infringement of Constantly Create Shop's copyright or exclusive rights under copyright and to pay such damages to Plaintiffs as to this Court shall appear just and proper within the provisions of the Copyright Act, or, in the alternative, at Plaintiffs' election, statutory damages for infringement of each separate copyright as set forth in 17 U.S.C. § 504;

4.    For an award of costs under 17 U.S.C. § 505 or as otherwise provided by law;

5.    For an award of attorneys' fees pursuant to 17 U.S.C. § 505;

6.    For an award of pre- and post-judgment interest in the maximum amount permitted by law;

7.    For such other and further relief as the Court may deem just and proper.

Dated: June 15, 2022
      Brooklyn, New York

By: _____
      Ievgeniia P. Vatrenko, Esq.
      2 Northside Piers
      Brooklyn, New York 11249
      Tel.: (718) 451-6384
      *Attorney for Plaintiffs*